# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00048-CV

**CNC Associates N.Y., Inc., Appellant**

**v.**

**Cabinets 345, Ltd., Appellee**

### FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY
### NO. C-1-CV-12-000408, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an interlocutory appeal from the trial court's denial of a special appearance asserted by a nonresident, appellant CNC Associates N.Y., Inc., to challenge a Travis County trial court's personal jurisdiction over it with respect to claims asserted by appellee Cabinets 345, Ltd.[1] Concluding that any bases for jurisdiction supported by the evidence were legally insufficient to satisfy due-process requirements, we will reverse the trial court's order and render judgment dismissing Cabinets 345's claims against CNC for want of personal jurisdiction.

In its suit against CNC, Cabinets 345 seeks recovery of approximately $115,000, plus attorney's fees, on theories of sworn account, breach of contract, quantum meruit, and promissory estoppel that are all founded on factual allegations that, in essence, CNC had purchased cabinets from Cabinets 345 but had not paid for them. In its live petition, Cabinets 345 acknowledges that CNC is a Texas nonresident—identifying a "business and process address" in the State of

---

[1] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(7); Tex. R. Civ. P. 120a.

New York—and pleads that CNC had "done business" in Texas so as to be subject to service of process under the Texas long-arm statute—specifically, that CNC had "contracted in writing with [Cabinets 345] to perform in Texas." *See* Tex. Civ. Prac. & Rem. Code § 17.042(1).[2] Cabinets 345 further pleads that "[CNC's] president, Nathan Indig, agreed in writing to make payments in Texas and to venue in Travis County, Texas."

CNC filed a verified special appearance[3] in which, in addition to denying that it was a Texas resident, it controverted the existence of any contract between it and Cabinets 345 or any other agreement to pay Cabinets 345 in Texas.[4] CNC also challenged the legal sufficiency of the jurisdictional facts Cabinets 345 had alleged, arguing the assertion of personal jurisdiction over it would violate due process—i.e., that it lacked sufficient "minimum contacts" in or with Texas to subject it to personal jurisdiction, that it has done nothing to "purposefully avail" itself to the benefits of doing business in Texas, and that the exercise of jurisdiction would be "unfair"—and that, in particular, due process would not be satisfied even if, as Cabinets 345 had alleged, CNC had contracted with Cabinets 345 or agreed to make payment in Texas.[5]

---

[2] *See Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010) ("We have consistently held that the plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of the Texas long-arm statute.") (citations omitted).

[3] *See id.* ("Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff. Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading.") (citation omitted); *see also* Tex. R. Civ. P. 120a(1).

[4] *See Kelly*, 301 S.W.3d at 659 ("The defendant can negate jurisdiction on either a factual or legal basis. Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations.").

[5] *See id.* at 659 ("Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction: the defendant's contacts with Texas

2

CNC's verified special appearance shifted the burden to Cabinets 345 to present evidence of the factual basis for jurisdiction that it had alleged—i.e., that it had, in fact, "contracted in writing with [Cabinets 345] to perform in Texas," and, in particular, that "[CNC's] president, Nathan Indig, [had] agreed in writing to make payments in Texas and to venue in Travis County, Texas."[6] Cabinets 345 attached to its live petition an affidavit from Peter Greenblum, who avers that he is an authorized agent and records custodian for the company.[7] Greenblum proves up three sets of documents as business records of Cabinets 345, which are attached to his affidavit as, respectively, Exhibits A, B, and C.[8] In its live petition, Cabinets 345 specifically identifies Exhibit B

---

fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction."); *see also id*. at 657 (observing that Texas's long-arm statute is intended to be coextensive with federal due-process requirements). Thus, the focus of CNC's legal challenge to personal jurisdiction was that it lacked sufficient "minimum contacts" to satisfy due process even with respect to a cause of action arising from or relating to those contacts—i.e., "specific jurisdiction"—let alone the far more extensive contacts required for "general jurisdiction." *Compare id*. at 657–58 (discussing specific jurisdiction) *with PHC-Minden, L.P. v. Kimberly-Clark Corp*., 235 S.W.3d 163, 166–69 (Tex. 2007) (discussing general jurisdiction).

For a comprehensive explanation of the underlying due-process concepts CNC is referencing, *see GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 867–70 (Tex. App.—Austin 2008, no pet.). It is ultimately not necessary for us to reiterate them fully here.

[6] *See Kelly*, 301 S.W.3d at 659 (in response to a special appearance challenging the existence of jurisdictional facts, "[t]he plaintiff can . . . respond with its own evidence that affirms the allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction").

[7] Cabinets 345's counsel in this case also shares the surname of Greenblum. Lest our references to "Greenblum" create confusion, we mean Peter Greenblum, the Cabinets 345 agent and representative who prepared the affidavit on behalf of the company, as distinguished from the attorney Greenblum, whom we will identify as "Cabinets 345's counsel."

[8] Cabinets 345 also purports to incorporate this affidavit (which would include the three attachments) by reference into its petition, but we perceive the distinction to be immaterial to our analysis.

as the "written agreement" by which CNC's Indig "agreed in writing to make payments in Texas and to venue in Travis County, Texas."

This "written agreement" attached as Exhibit B consists of a form titled "Confidential Credit Application" that is printed on letterhead of "Regency Cabinets," with a Laredo return address. Typed into the application is information reflecting that it was completed on behalf of "CNC Associates D/B/A Direct Builders," to which is ascribed a New Jersey address, by Nathan Indig, who is identified as CNC's president and CEO. Following this identifying information, the form elicits references and bank information, which CNC indicates was provided on a separate document.[9] After these portions of the form, which continue onto a second page, are a set of "TERMS AND AGREEMENTS" that immediately precede Indig's signature. The signed "TERMS AND AGREEMENTS" reflect that Indig agreed on behalf of CNC that, inter alia, CNC would "remit payment within the terms specified on the face of the invoice," pay service and collection charges on overdue balances, and pay "all amounts owed to Seller" at the same Laredo address previously identified as Regency's address. Indig and CNC likewise agreed to a forum-selection clause providing that venue for certain suits would be either in Webb County[10] or Travis County.[11]

The two other exhibits to Greenblum's affidavit are probative of the existence of a relationship between Regency—the party to the "written agreement" on which Cabinets 345 relies to establish personal jurisdiction—and Cabinets 345 itself. Exhibit A consists of an account

---

[9] The separate document is not in our record.

[10] I.e., where Laredo is located.

[11] Which, as the trial court observed, is where the office of Cabinets 345's counsel happens to be.

statement under Cabinets 345 letterhead[12] that purports to list amounts CNC owes on a series of invoices. However, beneath a heading referring to Cabinets 345, the invoice provides a return address for "The Great River Cabinet Company" that is in Laredo, Texas, and is a different address than the return address for Regency that is printed on the credit application. Exhibit C consists of a pair of letters from Cabinets 345's counsel, addressed to Indig and CNC, attaching account statements similar to Exhibit A and making demand for payment on behalf of Cabinets 345.[13] One of the letters alludes to a relationship between Cabinets 345, LLC, Great River, and Regency, referencing "the statements previously sent by The Great River Cabinet Co. and/or Regency Cabinets, both acquired by Cabinets [345]." Similarly, in the textual portion of Greenblum's affidavit, he avers, "Cabinets 345 acquired and owns The Great River Cabinet Co., and Regency Cabinets."

Greenblum's affidavit and the attached exhibits proved to be the sole evidence presented by the parties regarding the "written agreement" on which Cabinets 345 relies to establish personal jurisdiction. Following a hearing at which only argument was presented, the trial court overruled CNC's special appearance and made findings of fact and conclusions of law in support of its order. The ultimate conclusion on which its order was founded was that "[j]urisdiction in Texas and venue in Travis County, Texas is legally supported by the contract entered into by and between CNC and Regency, and therefore proper." Underlying this conclusion were two sets of findings. First, the trial court found the existence of a contract between CNC and Regency, specifically that:

---

[12] To be precise, the letterhead identifies "Cabinets 345, *LLC*," while the plaintiff below and appellee here has identified itself as Cabinets 345, *Ltd*. However, CNC does not suggest that this distinction is material, so we will assume it is not.

[13] Similar to the letterhead on the account statements, counsel states that he "represent[s] Cabinets 345, LLC."

5

- "[CNC] contracted with Regency Cabinets for CNC to purchase cabinets from Regency."

- "CNC submitted a credit application to Regency which was signed by Nathan Indig, CEO of CNC. A copy of that credit application is part of the Petition by Cabinets 345, Ltd. . . . in this case."

As for how this contract between CNC and *Regency* translated into personal jurisdiction over CNC with respect to *Cabinets 345's* claims, the trial court found that "[Cabinets 345's] pleadings include a letter from counsel for [Cabinets 345] to CNC stating [Cabinets 345's] allegation of the legal relationship between [Cabinets 345], The Great River Cabinet Co., and Regency Cabinets." The court further concluded that, consistent with the representations of Cabinets 345's counsel in this letter, "[Cabinets 345] acquired The Great River Cabinet Co., and Regency Cabinets."

CNC brings two issues on appeal, which can be summarized as challenges to both (1) the legal sufficiency of the evidence to support the trial court's findings of a contract between it and Regency or Cabinets 345,[14] and (2) whether any such findings that were supported by the evidence would, as a matter of law, satisfy the due-process prerequisites for Texas's assertion of personal jurisdiction over it.[15] While CNC presents numerous subsidiary contentions in support of

---

[14] *See id*. at 657, 659 & nn.7–8 (recognizing that where special appearance challenges existence of jurisdictional fact and plaintiff presents evidence to affirm the fact, trial court resolves the factual dispute, and its explicit or implicit findings are subject to review for legal and factual sufficiency of the evidence); *Ghosh*, 251 S.W.3d at 870–71 (same). Our standard for reviewing challenges to the legal and factual sufficiency of the evidence supporting fact findings are familiar and need not be repeated here. *See, e.g.*, *id.* at 871 (summarizing both standards).

[15] *See Kelly*, 301 S.W.3d at 657, 659 n.8 (recognizing that ultimate question of whether trial court can exercise personal jurisdiction over a nonresident defendant based on particular facts alleged or proven is one of law that we review de novo).

these two basic arguments, we need only consider two to conclude that we must reverse the trial court's order.[16]

First, CNC specifically challenges whether personal jurisdiction is supported by CNC's agreement to the forum-selection clause contained in CNC's credit application. Although the trial court's findings did not explicitly mention the forum-selection clause as one of the terms of the "contract" it found that CNC had formed with Regency, the court did find, to the same effect, that CNC had submitted the "credit application" to Regency, and it is undisputed the application contained the forum-selection clause.[17] Forum-selection clauses are presumptively enforceable,[18] and amount to a waiver of the due-process protections that would otherwise limit the forum state's assertion of personal jurisdiction over the signatory.[19] Consequently, if CNC had in fact agreed that suit could be brought against it in Travis County, this would be a straightforward case, at least with respect to CNC's rights vis-á-vis Regency. But CNC, in essence, challenges the legal sufficiency of the evidence supporting the trial court's finding of any such agreement. We agree that while there is evidence that CNC agreed to *a* forum-selection provision, there is no evidence that it agreed to one that impacted its due-process rights.

---

[16] *See* Tex. R. App. P. 47.1.

[17] We also observe, based on the reporter's record from the special-appearance hearing, that the forum-selection provision appeared to play an integral role in persuading an initially skeptical trial court that it had jurisdiction.

[18] *See, e.g.*, *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 675 (Tex. 2009) (per curiam) (orig. proceeding) (observing that "[f]orum-selection clauses are generally enforceable, and a party attempting to show that such a clause should not be enforced bears a heavy burden" (citing *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008) (per curiam) (orig. proceeding) (citing *In re AIU Ins. Co.*, 148 S.W.3d 109, 113 (Tex. 2004) (orig. proceeding)))).

[19] *See Burger King Co. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–05 (1982).

To analyze the forum-selection provision at issue here, we apply principles of contract construction,[20] which means that we ascertain and give effect to the intentions that the parties have objectively manifested through the words they have chosen. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam); *see Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) ("As with any other contract, the parties' intent is governed by what they said, not by what they *intended* to say but did not."). To that end, we construe the contract in its entirety, considering each part in relation to every other part so that the effect of each part on others may be determined and that no part will be rendered meaningless. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 808 (Tex. 2012). If we can give the contract a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006). If, on the other hand, the contract is subject to two or more reasonable interpretations, it is ambiguous, which creates a fact issue as to the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). However, lack of clarity does not create an ambiguity and "[n]ot every difference in the interpretation of a contract . . . amounts to an ambiguity." *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)).

---

[20] *See, e.g.*, *Southwest Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322, 324–25 (Tex. App.—Austin 1999, pet. denied).

The forum-selection clause, as previously noted, is contained in the "TERMS AND AGREEMENTS" portion of the credit application, which states:

> The above information being submitted for the purpose of allowing Regency Cabinets to assess and/or continue to assess credit on the undersigned account. The undersigned hereby represents and warrants that the information contained herein, or submitted in connection herewith, is true and complete as of the date hereof. We hereby authorize Regency Cabinets to contact and investigate the references, including the banks listed above, and we authorize the references to release the requested information. The undersigned hereby agrees to remit payment within the terms specified on the face of the invoice. If payment is not received when due, the undersigned also agrees to pay a monthly service charge equal to one and one half percent (1½%) of the unpaid delinquent balance until the account is paid in full. If the account is placed for collection, the undersigned agrees to pay all costs and expenses of collection, including attorneys' fees and expenses.

> The undersigned acknowledges and understands that Seller and the undersigned are obligated to pay all amounts owed to Seller at [the same Laredo address identified previously as Regency's return address]. In addition to Texas Civil Practice & Remedies Code § 15.035,[21] ***the undersigned agrees that suit may be brought by Regency Cabinets against Seller in Webb or Travis Counties, Texas.***

(Emphasis added.) The TERMS AND AGREEMENTS conclude with the forum-selection clause. Immediately below this line appears Indig's signature on behalf of CNC, and no other signatures.

It is beyond dispute that CNC is the "undersigned" referenced throughout the TERMS AND AGREEMENTS. It is likewise unambiguous that the forum-selection clause to which CNC agreed permits Regency to sue "***Seller***" in Webb or Travis County. "Seller" is not defined within

---

[21] Which provides, in relevant part:

. . . if a person has contracted in writing to perform an obligation in a particular county, expressly naming the county or a definite place in that county by that writing, suit on or by reason of the obligation may be brought against him either in that county or in the county in which the defendant has his domicile.

Tex. Civ. Prac. & Rem Code § 15.035(a).

the TERMS AND AGREEMENTS, nor in any preceding portion of the credit application. However, construed in context, "Seller" plainly cannot refer to CNC because the sentence immediately preceding the clause explicitly distinguishes the two, providing that the "***undersigned*** [i.e., CNC] acknowledges and understands that ***Seller and the undersigned*** are obligated to pay all amounts owed to ***Seller***" at a Laredo address corresponding to the address for Regency indicated on the letterhead of the form. *See City of Keller*, 168 S.W.3d at 811 (contracts must be construed in their entirety, considering the relation of each part to others so that no part will be rendered meaningless). Moreover, to the extent the ordinary meaning of a "seller" might be relevant to the parties' intended meaning of "Seller," the TERMS AND AGREEMENTS do not contemplate that CNC is or would be "selling" anything, as that term is commonly used, but rather purchasing goods. *See El Paso Field Servs., L.P.*, 389 S.W.3d at 808.

Although these conclusions may raise some potentially vexing questions as to who else the "Seller" mentioned in the forum-selection clause might have been intended to be,[22] the

---

[22] There is some textual support for construing "Seller" to be Regency. As previously noted, the TERMS AND AGREEMENTS indicate an address for "Seller" that corresponds to Regency's Laredo address. Furthermore, in a personal guarantee provision that appears below Indig's signature, and which the parties did not execute, Regency is explicitly defined as "Seller." This is the sole definition of "Seller" that appears anywhere in the credit application.

However, the definition of "Seller" in the guarantee provision is explicitly made applicable only "hereinafter," and thus does not apply to the TERMS AND AGREEMENTS, which preceded it. But still more importantly, the forum-selection clause itself explicitly contemplates that *Regency* could sue "Seller," which implies that the two are distinct, and would be meaningless surplusage if they were one and the same. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005).

One possible resolution of this question would be that the "Seller" is a person other than CNC or Regency—e.g., The Great River Cabinet Company—a construction that may be contemplated by the preceding portions of the TERMS AND AGREEMENTS obligating CNC to pay invoices "within the terms specified on the face of the invoice," but not specifying that Regency would necessarily be the person that issued such invoices or was paid thereunder. *See id*.;

TERMS AND AGREEMENTS, as written, are simply not susceptible to the construction that the "Seller" is CNC. Nor has Cabinets 345 pleaded or presented evidence to support any theory by which a court could disregard this unambiguous language. Accordingly, we cannot construe the forum-selection clause to represent CNC's consent to the personal jurisdiction of a Travis County court with respect to any suits brought against CNC by Regency or others, or to otherwise waive CNC's due-process protections against being haled into court there without having the required "minimum contacts" with Texas.

This brings us to CNC's second argument that is dispositive of this appeal, which is to the effect that the trial court did not find the existence of a contract between CNC and Regency that would satisfy the due-process prerequisites for asserting personal jurisdiction over it (apart from any findings based on the forum-selection clause, which, as indicated, lack evidence to support them). Again, we agree. The bare fact that a nonresident defendant has contracted with a Texas resident does not, in itself, suffice as the "minimum contacts" due process requires. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 786 (Tex. 2005) ("[T]he United States Supreme Court has emphatically answered the question whether a single contract with a Texas resident can automatically establish jurisdiction—'the answer is clearly that it cannot.'" (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985))).[23] Both high courts have rejected such "mechanical tests," *Burger King*, 471 U.S. at 478 (quoting *International Shoe Co.*

---

*see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996) (recognizing that text of contractual provisions may be construed in the context of "the circumstances surrounding the formation of the contract.") (citations omitted). Regardless, what ultimately matters here is that "Seller" plainly cannot be CNC under the TERMS AND AGREEMENTS as written.

[23] CNC also challenges whether there is legally sufficient evidence that Regency is a Texas resident. Our analysis assumes without deciding that it is.

11

*v. Washington*, 326 U.S. 310, 319 (1945)), and "conceptualistic . . . theories of the place of contracting or of performance," *id.* at 478–79 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316 (1943)), in favor of a "'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Id.* at 479 (quoting *Hoopeston Canning Co.*, 318 U.S. at 316–17). "It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* In other words, contacts, not the existence of a contract, per se, are what matters. *See Michiana*, 168 S.W.3d at 787.

The contacts between CNC and Texas found by the trial court ultimately boil down solely to CNC's agreement in the credit application to pay any invoices to "Seller" at a Laredo address. There are no findings or evidence regarding such potentially relevant facts as any preliminary negotiations involving Regency or other companies' personnel located in Texas, whether the cabinets in question were manufactured in Texas,[24] or whether the goods were shipped from there. In contrast, as both parties seemed to acknowledge below, the focus of the parties' dealings was to procure cabinets for a project in New York. Without more, we agree with CNC that the trial court's findings are not sufficient as a matter of law to support its assertion of personal jurisdiction. *See KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 393–94

---

[24] In fact, there was some indication by counsel during the hearing (but, again, no evidence) that the cabinets were fabricated in Mexico.

(Tex. App.—Dallas 2012, no pet.); *Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc.*, 80 S.W.3d 723, 727–30 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

Persuaded that the trial court lacked personal jurisdiction over CNC,[25] we must reverse its order denying CNC's special appearance and render judgment dismissing Cabinets 345's suit against it.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Reversed and Rendered

Filed:   August 30, 2013

---

[25] In this regard, we should note that Cabinets 345 opted not to file a brief on appeal.